UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LAWRENCE FENDERSON,

     Plaintiff,                  Civil Action No. 17-13620

         v.                District Judge Robert H. Cleland
                            Magistrate Judge R. Steven Whalen

COMMISSIONER OF SOCIAL
SECURITY,

     Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff Lawrence Fenderson ("Plaintiff") brings this action under 42 U.S.C. §405(g), challenging Defendant Commissioner's ("Defendant's") denial of his claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. The parties have filed cross-motions for summary judgment. Both motions have been referred for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B). For the reasons discussed below, I recommend that Defendant's Motion for Summary Judgment [Docket #16] be GRANTED, and that Plaintiff's Motion for Summary Judgment [Docket #11] be DENIED.

-1-

## PROCEDURAL HISTORY

On October 15, 2014, Plaintiff applied for SSI, alleging disability as of May 6, 2014[1] (Tr. 20, 151).   Following the initial denial of benefits, Plaintiff requested an administrative hearing, held on August 11, 2016 in Detroit, Michigan (Tr. 35). Administrative Law Judge ("ALJ") Carol Guyton presided.  Plaintiff, represented by attorney Andrea Hamm, testified (Tr. 40-59), as did Vocational Expert ("VE") Amelia Sheldon (Tr. 60-64).  On December 6, 2016, ALJ Guyton found that Plaintiff was not disabled (Tr. 20-30). On September 6, 2017, the Appeals Council denied review (Tr. 1-3).  Plaintiff filed suit in this Court on November 6, 2017.

## BACKGROUND FACTS

Plaintiff, born May 6, 1976, was 40 at the time of the administrative determination (Tr.  28, 30).  He received a GED in 1992 (Tr. 154).  His application states that he did not work in the 15 years prior to applying for disability (Tr. 154).  He alleges disability due to depression, diabetes, hearing voices, and an injury resulting in nerve damage to the hands and fingers (Tr. 153).

### A.  Plaintiff's Testimony

*Plaintiff's counsel prefaced her client's testimony by noting that based upon "information and belief," Plaintiff received state benefits at the age of 16 which were*

---

[1]Plaintiff later amended his alleged onset of disability date to October 15, 2014 (Tr. 151).

*terminated when he was incarcerated* (Tr. 40).

Plaintiff then offered the following testimony:

He stood 5' 10" and weighed 270 pounds (Tr. 41). He was right-handed and single (Tr. 41). He lived in a single family home with a friend and the friend's mother and daughter (Tr. 42). He held a driver's license and drove occasionally (Tr. 42). He had been driven to the hearing by his cousin (Tr. 42). He left school after ninth grade and did not have a GED (Tr. 43). He could read and write (Tr. 43). He received SSA from the ages of 14 to 17 after hitting his head in a car accident (Tr. 43). After the car accident, he received psychological treatment after he was seen "talking" to a deceased friend (Tr. 43).

As of the time of the hearing, he was unable to work due to his dislike of being with other people (Tr. 44). He currently took Reveron, Seroquel, insulin, hypertension medication, Neurontin, Listinopril and Norco (Tr. 45). He experienced the side effect of fatigue from Seroquel (Tr. 45). On a 10-point scale, he experienced level "three" to "four" pain of the knees, hands, and back despite the use of medication (Tr. 45-46). He did not use alcohol, cigarettes, or illicit drugs (Tr. 46).

Plaintiff's incarceration resulted from a conviction for passing bad checks (Tr. 46). He worked as a sweeper during his incarceration and spent 20 minutes a day sweeping (Tr. 46). He was unable to sit for no more than 30 minutes, stand for five, or walk for more than six blocks (Tr. 47). He avoided heavy lifting due to hand pain (Tr. 47).

Plaintiff testified that he was scared of other people and that he consorted with "[a] lot of [bad] people" (Tr. 48).  He spent a typical day listening to music, watching television, putting away groceries, and riding in a car with his cousin (Tr. 48).  His meal preparation was limited to making sandwiches or salads (Tr. 48).  He took his clothes out of the dryer but relied on others to fold them (Tr. 48).  He was able to unload clean dishes from a dishwasher (Tr. 49).  He seldom attended church (Tr. 49).  He was able to play checkers on a computer (Tr. 50).  He had a cell phone but did not use the texting function (Tr. 50).  He previously lived with a girlfriend but broke up because they were not able to "get along" (Tr. 51).

In response to questioning by his attorney, Plaintiff reported that Serequel caused daily fatigue (Tr. 51).  Due to fatigue, he was required to take naps at least three days a week (Tr. 52).  During his incarceration, his sweeping chores caused minor back pain while bending (Tr. 52).  He experienced ongoing knee and hand pain (Tr. 52).  He coped with the knee and hand pain by lying down a few times each day (Tr. 53).  He denied significant nighttime sleep disturbances (Tr. 53).  The mother of his friend reminded him to take his prescribed medications (Tr. 54).  While watching television or listening to music, Plaintiff would customarily turn up the volume to drown out the voices in his head (Tr. 54).  The voices were worse when he was around other people or when he thought "too much" (Tr. 55).  He spent most of his waking hours in his room with the door shut because he liked being by himself (Tr. 55).  His knees "popped" and because swollen frequently (Tr. 55).  He had been told by his doctor that his knees were "deteriorating" (Tr. 55).  He experienced knee swelling twice

a week at which time he either iced his knees or reclined (Tr. 56). His left knee was worse than the right (Tr. 56).

In addition to the knee problems, Plaintiff experienced daily numbness and pain in three of his right fingers and one on the left (Tr. 57). He experienced daily depression and sadness (Tr. 57). After an increase in Seroquel dosage, he did not hear voices as often (Tr. 58). He heard voices when he thought of his daughter or father, or, while with a group of unfamiliar people (Tr. 58). He was able to carry a gallon milk if he used both hands (Tr. 58). He experienced hand problems since he sustained stab wounds while fighting off an home intruder (Tr. 59). The lacerations from the fight required 52 stitches (Tr. 59).

### B. Medical Evidence[2]

#### 1. Treating Sources

September, 2009 emergency records note that Plaintiff sustained stab wounds to both hands (Tr. 281). A September, 2013 foot examination by Federal Bureau of Prisons ("BOP") was negative for diabetes complications (Tr. 285). March, 2014 records by the BOP note Plaintiff's report that the condition of diabetes was stable (Tr. 285). Plaintiff reported that he was "feeling well" (Tr. 285-286). He appeared psychologically unremarkable (Tr. 285, 302). Plaintiff requested a colonoscopy due to a family history of colon cancer (Tr. 288). July, 2014 records note Plaintiff's report of peripheral neuropathy

---

[2]Medical records predating the amended alleged onset date of October 15, 2014 are included for background purposes only.

(Tr. 403).  Plaintiff denied fatigue (Tr. 406).

January, 2015 records by Terry S. Baul, M.D. note a prescription for Cymbalta (Tr. 232). Psychological treating records state that Plaintiff reported depression resulting from his daughter's suicide while he was in prison (Tr. 270).  Plaintiff appeared fully oriented with normal impulse control and behavior (Tr. 270).  He was assigned a GAF of 40 due to a depressive disorder, diabetes, and situational stressors[3] (Tr. 272).

June, 2015 psychiatric intake records note Plaintiff's report of auditory hallucinations, paranoia, and racing thoughts (Tr. 225).  He reported that he left prison 10 months earlier but had not taken psychotropic medication since before entering prison in 2012 (Tr. 225). Plaintiff appeared depressed but demonstrated intact memory and normal awareness and concentration (Tr. 226-227).  Satyamurthy Kotamraju, M.D. assigned him a GAF of 50[4] due to a schizoaffective disorder and economic problems (Tr. 228-229).

August, 2015 imaging studies of the bilateral knees showed early osteoarthritis but no fracture or effusion (Tr. 234, 282).  Dr. Baul's records from the following month note a prescription for Norco (Tr. 229).  An October, 2015 medication review by Dr. Kotamraju notes that Plaintiff's degree of depression and psychotic activity had lessened with

---

[3]

A GAF score of 31 to 40 indicates "some impairment in reality testing or communication OR major impairment in several areas such as work, school, family relations, judgment, thinking or mood."*American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 2000), 34 ("*DSM-IV-TR*").

[4]

A GAF score of 41–50 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job.  *DSM-IV-TR*.

medication (Tr. 236).  Dr. Kotamrajun noted Plaintiff's report of normal sleep, appetite, and energy (Tr. 236).  Plaintiff demonstrated a normal memory and concentration (Tr. 236).  He reported that he was seeking treatment because he wanted medication to quell auditory hallucinations, obtain SSI, and find a house (Tr. 241, 249).  Counseling notes from the same month state that Plaintiff's previous exposures to mental health treatment were "marked by minimal effort or motivation and no significant success . . . ." (Tr. 253).  Dr. Baul's records from the following two month note a prescription for Norco (Tr. 266).

A December, 2015 mental health discharge summary records state that Plaintiff had completed his treatment goals after eleven month of counseling (Tr. 269).  He was assigned a GAF of 65[5] (Tr. 269).  His level of depression was rated at "none" (Tr. 269).

## 2. Non-Treating Sources

In December, 2014, psychiatrist R. Hasan, M.D. performed a consultive examination on behalf of the SSA, noting that Plaintiff had been treated with Risperdal, Haldol, Prozac, and Thorazine in the past and was currently taking Xanax (Tr. 215).  Plaintiff reported that he went to prison for the first time at the age of 18 for involuntary manslaughter (Tr. 215).  He alleged auditory hallucinations, paranoia, suicidal ideation, and short term memory problems (Tr. 215).  He reported "many psychiatric hospitalizations" (Tr. 215).  Plaintiff reported that he currently lived with his girlfriend and enjoyed watching television (Tr. 215).

---

[5]GAF scores in the range of 61 to 70 suggest "some mild symptoms or some difficulty in social, occupational, or school functioning." *DSM–IV–TR* at 34.

He noted that he could do light chores and cooking (Tr. 216). He reported hearing voices and "fleeting" suicidal ideation (Tr. 216).

Dr. Hasan noted a depressed mood but full orientation (Tr. 216). Plaintiff denied head trauma or seizures (Tr. 217). He concluded that Plaintiff could "understand, retain, and follow simple instructions" and was capable of handling his benefit funds (Tr. 217).

The same day, Cynthia Shelby-Lane, M.D. performed a consultative physical examination on behalf of the SSA, noting Plaintiff's report of depression, diabetes, and nerve damage to the hands (Tr. 218). She noted that Plaintiff obtained a GED but had never worked (Tr. 219).

Dr. Shelby-Lane noted that Plaintiff did not require the use of a walking aid (Tr. 220). She observed that he could tandem walk slowly, squat 80 percent distance and bend 90 percent (Tr. 220). She noted equal grip strength and a normal range of motion (Tr. 220). She found that Plaintiff needed to "follow up" on diabetes treatment on a consistent basis (Tr. 220, 222-224).

In February, 2015, Edward Czarnecki, Ph.D. performed a non-examining review of the treating and consultative records on behalf of the SSA, finding that due to the conditions of depression and anxiety, Plaintiff experienced mild limitation in activities of daily living and social functioning and moderate limitation in concentration, persistence, or pace (Tr. 71). He found that Plaintiff had moderate limitation in the ability to understand, remember, and carry out detailed instructions (Tr. 74). He also found moderate limitation in interacting with

the general public and in responding appropriately to changes in the work setting (Tr. 75).

Dr. Czarnecki noted that Plaintiff's "allegations of psychosis" were "vague and clinically

inconsistent" (Tr. 76). He found that Plaintiff had the capacity to initiate, sustain, and

complete simple tasks (Tr. 76).

### C. Vocational Expert Testimony

The ALJ posed the following question to VE Amelia Sheldon, describing a

hypothetical individual of Plaintiff's age, education, and lack of work history:

> [T]his person is limited to medium exertional work.[6] They can occasionally
> climb ramps and stairs, balance and crawl, kneel and stoop and crouch. They
> cannot climb ladders, ropes or scaffolding or be exposed to hazardous
> machinery, unprotected heights. They are limited to simple, routine tasks
> involving no more than simple, short instructions and simple work-related
> decisions with few workplace changes. There is to be no contact with the
> general public and only occasional contact with coworkers. So, with those
> limitations, would there be jobs that this person could do in the national
> economy? (Tr. 61).

The VE testified that given the above limitations, the individual could perform the unskilled,

exertionally medium work of an industrial cleaner (664,000 positions in the national

economy); linen room attendant (100,000); and sweeper (664,000) (Tr. 61). She testified that

---

[6]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds
at a time and occasionally lifting or carrying articles like docket files, ledgers, and small
tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or
carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50
pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and
that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with
frequent lifting or carrying of objects weighing up to 50 pounds. *Very Heavy* work requires
"lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of
objects weighing 50 pounds or more. § 404.1567(e).

if the same individual were additionally limited to light rather than medium work and experienced the additional limitations of frequent (as opposed to *constant*) handling and fingering with the upper extremities, the individual could perform the unskilled, exertionally light work of a marker (161,000); small assembler (100,000); and assembler (production) (100,000) (Tr. 62). The VE stated that the second set of positions allowed for "avoidance of hazardous machinery" (Tr. 62). The VE stated that if the same individual required a sit/stand option, the job numbers given in response to the second question would be reduced by 50 percent (Tr. 63). The VE stated that the need to be off task for 16 to 20 percent of the day or, the need to work "in isolation" would preclude all work (Tr. 63). The VE stated that her testimony was consistent with the information found in the *Dictionary of Occupational Titles* ("*DOT*") (Tr. 63). In response to questioning by Plaintiff's counsel, the VE stated that the need to miss two or more days of work each month would be work preclusive (Tr. 64).

### D.    The ALJ's Decision

Citing the medical records, ALJ Guyton found that Plaintiff experienced the severe impairments of "diabetes mellitus; peripheral neuropathy; status post lacerations and tendon injuries to the hands; osteoarthritis of the bilateral knees; obesity; schizoaffective disorder; [and] posttraumatic stress disorder " but that none of the conditions met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 22). She found that Plaintiff experienced mild limitation in activities of daily living and moderate limitation in social functioning and concentration, persistence, or pace (Tr. 23-24). The ALJ composed

a Residual Functional Capacity ("RFC") for light work with the following non-exertional

limitations:

> [C]laimant . . . can occasionally climb ramps and stairs, balance, crawl, kneel,
> stoop and crouch; can never climb ladders, ropes or scaffolds; can frequently
> handle and finger with the bilateral upper extremities; can never be exposed
> to hazardous machinery or unprotected heights; limited to simple routine tasks
> involving no more tha[n] simple short instructions and simple work-related
> decisions with few workplace changes; can have no contact with the general
> public; can have occasional contact with coworkers (Tr. 24-25).

Citing the VE's testimony, the ALJ found that Plaintiff could perform the light, unskilled

work of a marker, small assembler, and assembler (production)  (Tr. 29, 62).

The ALJ discounted Plaintiff's allegations of disability.  She noted that December,

2015 discharge records showed that Plaintiff had met "treatment goals" after attending

therapy for 11 months and showed improvement in handling "work, family and social

concerns" (Tr. 27).  She cited January and October, 2015 records noting good memory and

concentration (Tr. 28).  She noted that Dr. Hasan found that Plaintiff could "understand,

retain, and follow simple instructions" (Tr. 27).  As to the physical health records, the ALJ

cited Dr. Shelby-Lane's observation that Plaintiff could sit, stand, bend, stoop, carry, push,

pull, climb stairs, and perform fine and gross manipulation (Tr. 27).  The ALJ noted that

diabetes and the knee problems were treated successfully with medication (Tr. 27).

## **STANDARD OF REVIEW**

The district court reviews the final decision of the Commissioner to determine

whether it is supported by substantial evidence.  42 U.S.C. §405(g); *Sherrill v. Secretary of*

*Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATION

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe

impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy.  20 C.F.R. §416.920(a).  The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five  to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## **ANALYSIS**

Plaintiff makes four arguments for remand.  He contends first that the ALJ failed to explain her reasons for according only "some weight" to psychologist Dr. Czarnecki's non-examining review of the treating and consultative records. *Plaintiff's Brief,* 5-7, *Docket #11,* Pg ID 475.  He argues next that the ALJ failed to provide support for the finding of no more than moderate work-related psychological limitation. *Id.* at 7-10.  Third, he faults the ALJ for failing to perform a "function-by-function" analysis of Plaintiff's physical abilities as required by SSR96-8p. *Id.* at 10-11.  Fourth, he contends that the ALJ failed to consider the consequence of his medication side effects in making the non-disability finding. *Id.* at 11-12.

Because Plaintiff's second and third arguments (pertaining respectively to his alleged mental and physical limitations) are both based on the requirements of SSR 96-8p, they can be considered in tandem.

### A.  SSR 96-6p

Plaintiff argues first the ALJ failed to provide an explanation for according only "some weight" to Dr. Czarnecki's non-examining finding of moderate limitation regarding detailed work-related tasks, interacting with the public, and adapting to workplace changes. *Plaintiff's Brief* at 5-7 (*citing* (Tr. 27-28); SSR 96-6p, 1996 WL 374180 at *1 (July 2, 1996)).

SSR 96-6p requires that "[f]indings of fact made by State agency medical and psychological consultants and other program physicians and psychologists regarding the nature and severity of an individual's impairment(s) must be treated as expert opinion evidence . . . ."  1996 WL 374180 at *1.  In addition to recognizing that consultative and non-examining findings are "expert opinions," the Ruling states that ALJs  "may not ignore these opinions and must explain the weight given to these opinions in their decisions." *Id.*

Contrary to Plaintiff's claim, the ALJ provided more than adequate reasons for according only "some weight" to Dr. Czarnecki's opinion.  The ALJ cited Dr. Czarnecki's finding that Plaintiff could deal with simple tasks and brief interaction with others, and hold a low stress job (Tr. 27).   The ALJ then stated that the findings were given "some" rather than controlling weight because they were only "somewhat consistent" with the rest of the transcript showing that Plaintiff received only "sporadic mental health treatment" (Tr. 28). The ALJ cited January, 2015 intake records showing a normal memory and behavior; October, 2015 records stating that Plaintiff's depression was lifting; and December, 2015 discharge records  stating that Plaintiff did not experience any degree of depression (Tr. 27-

28).  The ALJ also cited Dr. Hasan's observation of normal concentration and memory and accorded those findings "great weight" (Tr. 28).  The ALJ's conclusion that the treating and consultative records supported a finding of no more (and arguably less) than moderate psychological limitation is also consistent with my own review of the record (Tr. 270, 272, 226-227, 236, 269).

Because the ALJ's assignment of only "some" weight to Dr. Czarnecki's conclusions is well explained and well supported, the ALJ's findings should be upheld.

### B.  The RFC (Plaintiff's Second and Third Arguments)

Plaintiff argues second that in providing a rationale for the RFC found in the administrative opinion, the ALJ failed to provide a analysis of the work-related psychological abilities as required by SSR 96-8p.  *Plaintiff's Brief* at 7-10 (*citing* 1996 WL 374184 at*1 (July 2, 1996)).  Likewise in his third argument, he contends that the ALJ did not provide a "'function-by-function'" discussion of the alleged physical limitations.  *Id.* at 10-11.

"RFC is what an individual can still do despite his or her limitations."  SSR 96-8p, 1996 WL 374184 at *2. "The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts" including objective findings, non-medical evidence, and activities of daily living. *Id.* at *7. The analysis must include the alleged psychological and physical limitations. 20 C.F.R. §§ 404.1545, 416.945. In crafting the RFC, the ALJ must consider how the psychological limitations affect the ability to "understand, carry out, and remember instructions; use judgment in making

-15-

work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting." SSR 96-8p at *6.   In addressing a claimant's exertionally capacities, she must consider the ability to sit, stand , walk , lift , carry , push, and pull.  *Id.* at *5.   However, "'[a]lthough a function-by-function analysis is desirable, SSR 96–8p does not require ALJs to produce such a detailed statement in writing.'" *Delgado v.CSS*, 30 Fed.Appx. 542, 547–548, 2002 WL 343402, at *5 (6th Cir. March 4, 2002)(*citing Bencivengo v. CSS*, 251 F.3d 153, slip op., 4 (Table)(3rd Cir. December 19, 2000)(punctuation added)).  " '[T]he ALJ need only articulate how the evidence in the record supports the RFC determination, discuss the claimant's ability to perform sustained work-related activities, and explain the resolution of any inconsistencies in the record.'" *Id.* (*citing Bencivengo* at slip op. at 5).

Plaintiff's argument that the ALJ failed to adequately explain the choice and degree of psychological limitation found in the RFC is not well taken.   Consistent with the requirements of SSR 96-8p, the ALJ acknowledged Dr.  Dr. Czarnecki's finding that Plaintiff could "initiate, sustain and complete simple tasks," "respond adequately" to superficial interaction with others, and deal with appropriately with work-related stress of a "low stress" environment (Tr. 27).  Although the ALJ noted that the consultative and treating records did not support the alleged degree of psychological limitation, he crafted an RFC limited to "simple routine tasks," "simple short instructions," "simple work-related decisions," "few workplace changes," with no contact with the general public and only occasional contact

-16-

with coworkers (Tr. 25).  Because the ALJ's rationale for the RFC acknowledged all of the factors to be considered determining the psychological abilities and is supported by substantial evidence,  Plaintiff's argument should be rejected.[7]

Plaintiff's argument that the ALJ did not consider the ability to lift or walk in crafting the physical RFC is likewise without merit.  The ALJ cited Dr. Shelby-Lane's observations in support of the finding that Plaintiff could walk for up to six hours a day and lift up to 20 pounds as required for exertionally light work (Tr. 27); *see* fn 6, *above*.  She noted Dr. Shelby-Lane's observation of a normal gait and that Plaintiff did not require the use of an assistive device (Tr. 26-27, 220).   Consistent with the ALJ's conclusion, Dr. Shelby-Lane found no atrophy or range of motion limitations (Tr. 220).  She observed that Plaintiff could climb stairs, had equal grip strength bilaterally and had normal reflexes in all extremities (Tr. 220, 223-224).   Consistent with the adoption of Dr. Shelby-Lane's findings, the ALJ also noted that Plaintiff obtained good results from non-steroidal medication prescribed for knee

---

[7]

In regard to the alleged psychological limitations, Plaintiff also cites SSR 85-15 which states in relevant part that "basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting." 1985 WL 56857, at *4.  SSR 85-15 notes that a "substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base." It is unclear how SSR 85-15 applies to the current argument.  The VE's testimony that the limitations stated in the hypothetical question (forming the basis of the RFC) would allow for a significant range of light work constitutes substantial evidence in support of the Step Five determination (Tr. 23-24, 62).

pain and noted that Plaintiff did not exhibit any limitations of the upper extremities, much less provide evidence that he was incapable of the lifting requirements of light work (Tr. 26).

As such, the ALJ did not err by concluding that Plaintiff could perform the lifting and walking requirements of light work.

### C.  The Alleged Medication Side Effects

Last, Plaintiff's cites SSR 96-7p in support of the argument that the ALJ failed to consider his alleged medication side effects in making the non-disability determination. *Plaintiff's Brief* at 11-12.

SSR 16–3p sets forth the standard for evaluating the alleged limitations using a two-step process.[8]  2016 WL 1119029, at *3 (Mar. 16, 2016).  First, the ALJ determines whether the claimant has a medically-determinable impairment that could reasonably be expected to produce the alleged pain or limitation. *Id.*  Next, the ALJ evaluates the claims of limitation not reflected in the objective evidence. *Id.* at *3-4. The ALJ must consider "the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information

---

[8]

SSR 16-3p rather than SSR 96-7p applies to the evaluation of a claimant's subjective allegations in administrative determinations made on or after March 28, 2016, including the current administrative decision of December 6, 2016.  In contrast to the superceded Ruling (SSR 96-7p), the newer Ruling eliminates the use of the term "credibility" from SSA policy. SSR 16-3p, 2016 WL 1119029, *1 (Mar. 16, 2016). The Ruling states that "subjective symptom evaluation is not an examination of an individual's character." Instead, ALJs are directed to "more closely follow [the] regulatory language regarding symptom evaluation." *Id.* at *1-3; See 20 C.F.R. §§ 404.1529(c)(3), 416.929.

provided by medical sources and other persons; and any other relevant evidence in the individual's case record." *Id.*

Plaintiff is correct that in addition to an analysis of the medical evidence, the ALJ must consider the "type, dosage, effectiveness, and side effects of any medication" taken to "alleviate . . . pain or other symptoms," along with the type and quantity of treatment; daily activities; alternative methods for relieving pain; and the "location, duration, intensity, and frequency" of pain.   20 C.F.R. §§ 404.1529(c)(3), 416.929.   Contrary to the present argument however, the ALJ acknowledged Plaintiff's testimony that his medication "sometimes causes drowsiness" (Tr. 25, 51-52).   Further, despite the allegations of disabling fatigue, the ALJ provided a number of well supported reasons for concluding that the allegations of disability level impairment were not supported by the record (Tr. 26).   As to Plaintiff's claim that the side effect of Seroquel prevented him from working, the ALJ cited January, 2015 intake records noting a normal memory, clear thought processes and appropriate behavior (Tr. 26, 270).   The ALJ citing June and October, 2015 records showing normal memory and concentration (Tr. 26-27, 226-227, 236).   In particular, the October, 2015 finding that Plaintiff reported normal sleep, appetite, and *energy* (along with good memory and concentration) supports the finding that Plaintiff was capable of a significant range of unskilled, low stress work despite the regular use of medication (Tr. 236).   The ALJ also noted that the December, 2015 discharge records did not show any degree of mood, behavioral, or concentrational limitation (Tr. 27).   The treating observations that he did not

experience concentrational or memory problems are particularly significant, given that the they were made by mental rather than physical care providers.

My own review of the records further supports the non-disability finding. The BOP records, while admittedly predating the alleged onset of disability, do not suggest any degree of psychological impairment. The January, 2015 intake and December, 2015 discharge records indicate that Plaintiff's depression was brought on by the death of a family rather than longstanding, disabling mental health problems. Other records from the relevant period, show that Plaintiff was able to interact with others on a social basis and within his household. The October, 2015 records state that Plaintiff planned to get a house after being awarded benefits. Counseling notes from the same month suggest that Plaintiff's lack of motivation was a least partially responsible for his previous failures to follow through with mental health treatment (Tr. 253).

Because the determination that Plaintiff was not disabled is well within the "zone of choice" accorded to the fact-finder at the administrative hearing level, it should not be disturbed by this Court. *Mullen v. Bowen*, *supra*.

## CONCLUSION

For these reasons, I recommend that Defendant's Motion for Summary Judgment [Docket #16] be GRANTED, and that Plaintiff's Motion for Summary Judgment [Docket #11] be DENIED.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987).

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated: November 26, 2018

## CERTIFICATE OF SERVICE

I hereby certify on November 26, 2018, I electronically filed the foregoing paper with the Clerk of the Court sending notification of such filing to all counsel registered electronically. I hereby certify that a copy of this paper was mailed to non-registered ECF participants on November 26, 2018.

s/Carolyn Ciesla
Case Manager to
Magistrate Judge R. Steven Whalen